# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MISSOURI

SEMSUDIN KUDIC, (A# 075 137 187),

  9407 Reavis Barracks Road
  St. Louis, MO 63123

   Plaintiff,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

Serve:  Office of the General Counsel
        Department of Homeland Security
        Mail Stop 3650
        Washington, D.C. 20528

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,

Serve:  U.S. Citizenship & Immigration
        Services
        425 I. Street, N.W., Room 6100
        Washington, D.C. 20536

JOHN F. KELLY, Secretary of the
Department of Homeland Security,

Serve:  Office of the General Counsel
        Department of Homeland Security
        Mail Stop 3650
        Washington, D.C. 20528

JEFFERSON B. SESSIONS, Attorney
General of the United States,

Serve: Jefferson B. Sessions
        Attorney General
        Department of Justice
        950 Pennsylvania Ave., NW
        Washington, D.C. 20530

Case No. 4:17-cv-2128

JAMES MCCAMENT, Acting Director of the
U.S. Citizenship & Immigration Services,

Serve:  U.S. Citizenship & Immigration
         Services
         425 I. Street, N.W., Room 6100
         Washington, D.C. 20536


CHESTER MOYER, Director of the St.
Louis Field Office of the United States
Citizenship and Immigration Services,

Serve:  Mr. Chester Moyer
         USCIS
         1222 Spruce St., Suite 2.205
         St. Louis, MO 63103

and

ANDREW MCCABE, Interim Director of the
Federal Bureau of Investigation,

Serve: Andrew McCabe
        FBI Headquarters
        935 Pennsylvania Ave., NW
        Washington, DC 20535-0001


        Defendants.

## COMPLAINT IN THE NATURE OF MANDAMUS ARISING FROM DEFENDANTS' REFUSAL TO ADJUDICATE PLANTIFF'S APPLICATION FOR ADJUSTMENT OF STATUS

COMES NOW Plaintiff Semsudin Kudic to respectfully request that this Honorable Court issue a writ of mandamus compelling Defendants to adjudicate his long-pending applications for adjustment of status.

1.      This lawsuit challenges the Defendants' unlawful delay of Plaintiff's

application for adjustment of status under a secretive policy that has blacklisted Plaintiff as a "national security concern," when in fact he is not, and illegally prohibited him from upgrading his immigration status to that of lawful permanent resident, despite his eligibility to do so.

2.      Plaintiff Semsudin Kudic is a law-abiding, long-time resident of the United States who was granted refugee status and admitted to the United States on March 18, 1997.

3.      Plaintiff resides in St. Louis, MO and within this judicial district.

4.      On **June 2, 2006**, Plaintiff filed an application to adjust status to that of lawful permanent resident after spending more than one year in the U.S. as a refugee.

5.      Plaintiff is a citizen of Bosnia.  He was raised as a Muslim and adherent of the Islamic faith.

6.      Plaintiff has successfully completed his biometrics appointment.

7.      Since then, the Defendants have taken no action on the pending adjustment application.

8.      USCIS has refused to adjudicate Plaintiff'' application in accordance with applicable legal criteria. Instead, USCIS has applied different rules under a policy known as the Controlled Application Review and Resolution Program ("CARRP"), which has resulted in the agency refusing to adjudicate Plaintiff's applications.

9.      Plaintiff has made repeated requests to USCIS to have his case adjudicated.

10.     Plaintiff brings this action to compel the USCIS to finally—after **eleven**

years of waiting—adjudicate his pending applications as required by law.

11.    The Constitution expressly assigns to Congress, not the executive branch, the authority to establish uniform rules of adjustment of status. The Immigration and Nationality Act ("INA") sets forth such rules.

12.    When these rules and requirements have been met, as they have been in Plaintiff's case, USCIS is obligated to grant adjustment.

13.    Since 2008, however, USCIS has used CARRP—an internal policy that has neither been approved by Congress nor subjected to public notice and comment—to investigate and adjudicate applications deemed to present potential "national security concerns."

14.    CARRP prohibits USCIS field officers from approving an application with a potential "national security concern," instead directing officers to deny the application or delay adjudication—often indefinitely—in violation of the INA.

15.    CARRP's definition of "national security concern" is far more expansive than the security-related ineligibility criteria for immigration applications set forth by Congress in the INA.

16.    CARRP identifies "national security concerns" based on deeply-flawed and expansive government watchlists, and other vague and imprecise criteria that bear no relation to the security-related statutory ineligibility criteria.

17.    The CARRP definition illegally brands innocent, law-abiding residents, like Plaintiff, who does not pose a security threat, as "national security concerns" on account of innocuous activity and associations, innuendo, suppositions and characteristics such

as national origin.

18.     Although the total number of people subject to CARRP is not known, USCIS data reveals that between FY2008 and FY2012, more than 19,000 people from twenty-one Muslim-majority countries or regions were subjected to CARRP.

19.     Due to CARRP, USCIS has not adjudicated Plaintiff's application, as the law requires.

20.     Although USCIS has thus far prevented Plaintiff from adjusting status, the Defendants have not notified Plaintiff that they consider him to be a potential "national security concern," provided the reasons why they have classified him in this way, or afforded him any opportunity to address and correct any basis for USCIS's concerns.

21.     Plaintiff therefore requests that the Court enjoin USCIS from applying CARRP to his immigration application and declare that CARRP violates the INA; the Due Process Clause of the Fifth Amendment to the U.S.  Constitution; and the Administrative Procedure Act ("APA").

## PARTIES

22.     Plaintiff is citizen of Bosnia, a predominantly Muslim country.  He was born and raised as a Muslim.

23.     Plaintiff has sought the assistance of the USCIS Ombudsman for help in getting the case resolved.  This was of no avail.

24.     Plaintiff has made repeated InfoPass appointments.  This too has led nowhere and the case continues to languish.

25.     Defendants have repeatedly relayed to Plaintiff that his case is being

delayed due to "background checks."

26.     Defendant Department of Homeland Security (hereinafter sometimes referred to as "the DHS") is the agency of the United States that is responsible for implementing the legal provisions governing applications for adjustment of status.

27.     Defendant United States Citizenship and Immigration Services (hereinafter sometimes referred to as "USCIS") is the component of the DHS that is responsible for processing petitions applications for adjustment of status.

28.     Defendant John F. Kelly, the Secretary of the DHS, is the highest ranking official within the DHS.  Kelly, by and through his agency for the DHS, is responsible for the implementation of the Immigration and Nationality Act (hereinafter sometimes referred to as "the INA"), and for ensuring compliance with applicable federal law, including the Administrative Procedures Act (hereinafter sometimes referred to as "the APA").  Kelly is sued in his official capacity as an agent of the government of the United States.

29.     Defendant James McCament, Director of the USCIS, is the highest ranking official within the USCIS.  McCament is responsible for the implantation of the INA and for ensuring compliance with all applicable federal laws, including the APA. McCament is sued in his official capacity as an agent of the government of the United States.

30.     Defendant Chester Moyer, Director of the St. Louis Field Office of the USCIS, is the highest ranking official within the St. Louis Field Office.  The St. Louis Field District Office has jurisdiction over applications for adjustment of status for

6

immigrants in portions of the State of Missouri, including St. Louis, Missouri, where Plaintiff resides. Moyer is responsible for the implantation of the INA and for ensuring compliance with all applicable federal laws, including the APA. Moyer is sued in his official capacity as an agent of the government of the United States.

31.     Defendant Andrew McCabe is the Interim Director of the Federal Bureau of Investigation and he is sued only in his official capacity, as well as his successors and assigns. The FBI is headquartered at 935 Pennsylvania Avenue, NW, Washington, DC 20535.

32.     Defendants, who are officers of CIS and the Federal Bureau of Investigation ("FBI"), the Secretary of the Department of Homeland Security, and the Attorney General of the United States, are responsible for the adjustment of status process.

33.     In November 2002, Defendants drastically altered the adjustment of status procedure by requiring a vastly expanded FBI name check to be conducted on every application even though it is not required by either statute or regulation. Implementation of this unwarranted and cumbersome new name check procedure has resulted in months-long and even years-long delays.

34.     CIS's own Ombudsman has stated that the FBI name check used in adjustment applications is of questionable value in detecting persons who may pose a threat to security. Nevertheless, CIS uses the FBI name check without imposing deadlines for completion. In requiring and conducting name checks, both CIS and the FBI have acted with complete disregard for Congress' plain directive that CIS should

complete the processing of adjustment applications within a reasonable amount of time. Through their use of FBI name checks, CIS and the FBI have unreasonably delayed the processing of the adjustment application of Plaintiff, and CIS has unlawfully withheld final adjudication of this application.

35.     Defendants' unlawful conduct has deprived Plaintiff of the privileges of lawful permanent resident status. Plaintiff respectfully requests that the Court require the Defendants to adjudicate his applications for adjustment within the time periods prescribed by law, and declare that the Defendants' actions violate the applicable statute and regulations, laws governing administrative agency action and the Due Process Clause of the Fifth Amendment.

## JURSIDICTION AND VENUE

36.     This Honorable Court has federal question jurisdiction over this cause pursuant to 28 U.S.C. § 1331, as it raises claims under the Constitution of the United States, the INA, 8 U.S.C. § 1101 *et seq*., and the APA, 5 U.S.C. § 701 *et seq*., in conjunction with the Mandamus Act, 28 USC § 1361.

37.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) because (1) the Defendants are agencies of the United States or officers or employees thereof acting in their official capacity or under color of legal authority; (2) no real property is involved in this action, and; (3) Defendants DHS, USCIS, Kelly, Sessions and Moyer maintain offices within this judicial district.   Upon information and belief, Plaintiff's case is currently being held at the St. Louis field office of USCIS.

## LEGAL FRAMEWORK

38.    Plaintiff is eligible to adjust status to permanent residence under INA §245(a), 8 U.S.C. §1255.

39.    Defendants' delay in adjudicating this application is producing a hardship on Plaintiff, including problems in proving his authorization to work and difficulty in dealing in state driver's license matters.  The Defendants' failure to act also impacts the ability of Plaintiff to eventually apply for naturalization and/or apply to bring family members to the United States, if applicable.

40.    Plaintiff is unable to resolve this matter through administrative channels or otherwise, and mandamus and APA relief are the only viable means of obtaining the adjudication of Plaintiff's application.

41.    Defendants' delay in adjudicating these application for nearly four years is unreasonable in relation to their stated processing times for like applications.

42.    The APA provides a remedy to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(l) (West 2007).

43.    Mandamus is a remedy available for extreme agency delay where the agency has not performed a mandatory action. 28 U.S.C. § 1361 (West 2007).

44.    Defendants have unreasonably delayed and failed to perform a mandatory action in adjudicating Plaintiff's application for lawful permanent residence filed nearly two years ago, thereby depriving Plaintiff of his right to the benefits of U.S. permanent residence.

45.    Defendants owe Plaintiff the duty to act upon his application and have

unreasonably failed to perform these duties.

## **FACTUAL BACKGROUND**

*Controlled Application Review and Resolution Program*

46.     In April 2008, USCIS created CARRP, an agency-wide policy for identifying, processing, and adjudicating immigration applications that raise "national security concerns."

47.     Upon information and belief, prior to CARRP's enactment, USCIS simply delayed the adjudication of many immigration applications that raised possible "national security concerns," in part due to backlogs created by the FBI Name Check.

48.     Congress did not enact CARRP, and USCIS did not promulgate it as a proposed rule with the notice-and-comment procedures mandated by the APA.  See 5 U.S.C. § 553(b)-(c).

49.     Since CARRP's inception, USCIS has not made information about CARRP available to the public, except in response to Freedom of Information Act ("FOIA") requests and litigation to compel responses to those requests. In fact, the program was unknown to the public, including applicants for immigration benefits, until it was discovered in litigation challenging an unlawful denial of naturalization and then through the government's response to a FOIA request.

50.     CARRP directs USCIS officers to screen immigration applications—including applications for asylum, visas, lawful permanent residency, and naturalization—for "national security concerns."

51.     If a USCIS officer determines that an application presents a "national

security concern," it takes the application off a "routine adjudication" track and—without notifying the applicant—places it on a CARRP adjudication track where it is subject to procedures and criteria unique to CARRP that result in lengthy delays and prohibit approvals, except in limited circumstances, regardless of an applicant's statutory eligibility.

*CARRP's Definition of a "National Security Concern"*

52.     According to the unauthorized CARRP definition utilized by Defendants, a "national security concern" arises when "an individual or organization [that] has been determined to have an articulable link"—no matter how attenuated or unsubstantiated—"to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act." Those sections of the INA make inadmissible or removable any individual who, inter alia, "has engaged in terrorist activity" or is a member of a "terrorist organization."

53.     For the reasons described herein, an individual need not be actually suspected of engaging in any unlawful activity or joining any forbidden organization to be branded a "national security concern" under CARRP.

54.     CARRP purportedly distinguishes between two types of "national security concerns": those ostensibly involving "Known or Suspected Terrorists" ("KSTs"), and those ostensibly involving "non-Known or Suspected Terrorists" ("non-KSTs").

55.     USCIS automatically considers an applicant a KST, and thus a "national security concern," if his or her name appears in the Terrorist Screening Database

("TSDB") (also referred to as the Terrorist Watch List). USCIS, therefore, applies CARRP to any applicant whose name appears in the TSDB, regardless as to whether they actually belong on the list.

56.    Upon information and belief, the TSDB includes as many as one million names, many of whom present no threat to the United States.

57.    The government's recently disclosed criteria for watchlist nominations, known as the Watchlisting Guidance, impermissible allows non-U.S. citizens, including LPRs, to be listed in the TSDB even where the government does not have "reasonable suspicion" of involvement with terrorist activity.

58.    The Guidance permits the watchlisting of non-citizens and LPRs simply for being associated with someone else who has been watchlisted, even when any involvement with that person's purportedly suspicious activity is unknown.

59.    The Guidance further provides that non-citizens and LPRs may be watchlisted based on fragmentary or uncorroborated information, or information of "suspected reliability." These extremely loose standards significantly increase the likelihood that the TSDB contains information on individuals who are neither known nor appropriately suspected terrorists.

60.    To make matters worse, the Terrorist Screening Center ("TSC"), which maintains the TSDB, has failed to ensure that innocent individuals are not watchlisted or are promptly removed from watchlists.

61.    In the year 2013, the watchlisting community added 468,749 individuals to the TSDB, and the TSC rejected only approximately one percent of those nominations.

62.    In 2009, the Government Accountability Office found that 35 percent of the nominations to the TSDB were outdated, and that tens of thousands of names had been placed on the list without an adequate factual basis.

63.    The Inspector General of the Department of Justice has criticized the Terrorist Screening Center, which maintains the TSDB, for employing weak quality assurance mechanisms and for failing to remove subjects from the TSDB when information no longer supports their inclusion. Public reports also confirm that the government has nominated or kept people on government watchlists as a result of human error.

64.    The federal government's official policy is to refuse to confirm or deny give individuals' inclusion in the TSDB or provide a meaningful opportunity to challenge that inclusion.

65.    Nevertheless, individuals can become aware of their inclusion due to air travel experiences. In particular, individuals may learn that they are on the "Selectee List," a subset of the TSDB, if they have the code "SSSS" listed on their boarding passes. They may also learn of their inclusion in the TSDB if U.S. federal agents regularly subject them to secondary inspection when they enter the United States from abroad or when boarding a flight over U.S. airspace. Such individuals are also often unable to check in for flights online or at airline electronic kiosks at the airport.

66.    Where the KST designation does not apply, CARRP instructs officers to look for "indicators" of a "non-Known or Suspected Terrorist" ("non-KST") concern.

67.    These indicators fall into three categories: (1) statutory indicators; (2)

13

non-statutory indicators; and (3) indicators contained in security check results.

68.    "Statutory indicators" of a "national security concern" arise when an individual generally meets the definitions described in Sections 212(a)(3)(A), (B), and (F), and 237(a)(4)(A) and (B) of the INA (codified at 8 U.S.C. § 1182(a)(3)(A), (B), and (F) and § 1227(a)(4)(A) and (B)), which list the security and terrorism grounds of inadmissibility and removability.

69.    However, CARRP expressly defines statutory indicators of a "national security concern" more broadly than the statute, stating "the facts of the case do not need to satisfy the legal standard used in determining admissibility or removability" under those provisions of the INA to give rise to a "non-KST" "national security concern."  This is illegal and contrary to law.

70.    For example, CARRP specifically directs USCIS officers to look at evidence of charitable donations to organizations later designated as financiers of terrorism by the U.S. Treasury Department and to construe such donations as evidence of a "national security concern," even if an individual had made such donations without any knowledge or any reasonable way of knowing that the organization was allegedly engaged in proscribed activity.  Such conduct would not make an applicant inadmissible for a visa or lawful permanent resident status under the statute, see INA § 212(a)(3)(B), 8 U.S.C. § 1182(a)(3)(B), nor does it have any bearing on an adjustment application.

71.    "Non-statutory indicators" of a "national security concern" include "travel through or residence in areas of known terrorist activity"; "large scale transfer or receipt of funds"; a person's employment, training, or government affiliations; the identities of a

person's family members or close associates, such as a "roommate, co-worker, employee, owner, partner, affiliate, or friend"; or simply "other suspicious activities."

72.    Finally, security check results are considered indicators of a "national security concern" in instances where, for example, the FBI Name Check—one of many security checks utilized by USCIS—produces a positive hit on an applicant's name and the applicant's name is associated with a national security related investigatory file. Upon information and belief, this indicator leads USCIS to label applicants "national security concerns" solely because their names appear in a law enforcement or intelligence file, even if they were never the subject of an investigation.

73.    Thus, an applicant's name could appear in a law enforcement file in connection with a national security investigation because he or she once gave a voluntary interview to an FBI agent, he or she attended a mosque that was the subject of FBI surveillance, or he or she knew or was associated with someone under investigation.

74.    Upon information and belief, CARRP labels applicants "national security concerns" based on vague and overbroad criteria that often turn on lawful activity, national origin, and innocuous associations. These criteria are untethered from the statutory criteria that determine whether or not a person is eligible for the immigration status they seek, and are so general that they necessarily ensnare individuals who pose no threat to the security of the United States.

*Delay and Denial*

75.    Once a USCIS officer identifies a CARRP-defined "national security

15

concern," the application is subjected to CARRP's rules and procedures that guide officers to deny such applications or, if an officer cannot find a basis to deny the application, to delay adjudication as long as possible.

76.     One such procedure is called "deconfliction," which requires USCIS to coordinate with—and, upon information and belief, subordinate its authority to—the law enforcement agency, often the FBI, that possesses information giving rise to the supposed national security concern.

77.     During deconfliction, the relevant law enforcement agency has authority to instruct USCIS to ask certain questions in an interview or to issue a Request for Evidence ("RFE"); to comment on a proposed decision on the benefit; and to request that an application be denied, granted, or held in abeyance for an indefinite period of time.

78.     Upon information and belief, deconfliction not only allows law enforcement or intelligence agencies to directly affect the adjudication of a requested immigration benefit, but also results in independent interrogations of the immigration applicant—or the applicant's friends and family—by agencies such as the FBI.

79.     Upon information and belief, USCIS often makes decisions to deny immigration applications because the FBI requests or recommends the denial, not because the person was statutorily ineligible for the benefit. The FBI often requests that USCIS hold or deny an application not because the applicant poses a threat, but because it seeks to use the pending immigration application to coerce the applicant to act as an informant or otherwise provide information.

16

80.     In addition to "deconfliction," once officers identify an applicant as a "national security concern," CARRP directs officers to perform an "eligibility assessment" to determine whether the applicant is eligible for the benefit sought.

81.     Upon information and belief, at this stage, CARRP instructs officers to look for any possible reason to deny an application so that "valuable time and resources are not unnecessarily expended" to investigate the possible "national security concern." Where no legitimate reason supports denial of an application subjected to CARRP, USCIS officers often invent false or pretextual reasons to deny the application.

82.     Upon information and belief, if, after performing the eligibility assessment, an officer cannot find a reason to deny an application, CARRP instructs officers to first "internally vet" the "national security concern" using information available in DHS systems and databases, open source information, review of the applicant's file, RFEs, and interviews or site visits.

83.     After conducting the eligibility assessment and internal vetting, USCIS officers are instructed to again conduct "deconfliction" to determine the position of any interested law enforcement agency.

84.     If the "national security concern" remains and the officer cannot find a basis to deny the benefit, the application then proceeds to "external vetting."

85.     During "external vetting," USCIS instructs officers to confirm the existence of the "national security concern" with the law enforcement or intelligence agency that possesses the information that created the concern and obtain additional information from that agency about the concern and its relevance to the individual.

17

86.    CARRP authorizes USCIS officers to hold applications in abeyance for periods of 180 days to enable law enforcement agents and USCIS officers to investigate the "national security concern." The Field Office Director may extend the abeyance periods so long as the investigation remains open.

87.    Upon information and belief, CARRP provides no outer limit on how long USCIS may hold a case in abeyance, even though the INA requires USCIS to immigration applications, including for naturalization and lawful permanent residence, within 180 days of filing the application. 8 U.S.C. § 1571(b).

88.    When USCIS considers an applicant to be a KST "national security concern," CARRP forbids USCIS field officers from granting the requested benefit even if the applicant satisfies all statutory and regulatory criteria.

89.    When USCIS considers an applicant to be a non-KST "national security concern," CARRP forbids USCIS field officers from granting the requested benefit in the absence of supervisory approval and concurrence from a senior level USCIS official.

90.    In *Hamdi v. USCIS*, 2012 WL 632397, when asked whether USCIS's decision to brand naturalization applicant Tarek Hamdi as a "national security concern" affected whether he was eligible for naturalization, a USCIS witness testified at deposition that "it doesn't make him statutorily ineligible, but because he is a—he still has a national security concern, it affects whether or not we can approve him." The witness testified that, under CARRP, "until [the] national security concern [is] resolved, he won't get approved."

91.    Upon information and belief, USCIS often delays adjudication of

18

applications subject to CARRP when it cannot find a reason to deny the application. When an applicant files a mandamus action to compel USCIS to finally adjudicate his or her pending application, it often has the effect of forcing USCIS to deny a statutorily-eligible application because CARRP prevents agency field officers from granting an application involving a "national security concern."

92.     CARRP effectively creates two substantive regimes for immigration application processing and adjudication: one for those applications subject to CARRP and one for all other applications. CARRP rules and procedures create substantive eligibility criteria that exclude applicants from immigration benefits to which they are entitled by law.

93.      At no point during the CARRP process is the applicant made aware that he or she has been labeled a "national security concern," nor is the applicant ever provided with an opportunity to respond to and contest the classification.

94.     Upon information and belief, CARRP results in extraordinary processing and adjudication delays, often lasting many years, and baseless denials of statutorily-eligible immigration applications.

## COUNT I - IMMIGRATION & NATIONALITY ACT AND IMPLEMENTING REGULATIONS

95.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

96.     To secure adjustment of status, an applicant must satisfy certain statutorily -enumerated criteria.

97.    By its terms, CARRP creates additional, non-statutory, substantive criteria that must be met prior to a grant of an adjustment application.

98.    Accordingly, CARRP violates several provisions which set forth the exclusive applicable statutory and regulatory criteria for a grant of adjustment.

99.    Because of this violation and because CARRP's additional, non-statutory, substantive criteria have been applied to Plaintiff.  Plaintiff has suffered and continues to suffer injury in the form of an unreasonable delay of his application for adjustment.

## COUNT II - UNIFORM RULE OF ADJUSTMENT

100.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

101.    Congress has the sole power to establish criteria for adjustment of status, and any additional requirements, not enacted by Congress, are *ultra vires*.

102.    By its terms, CARRP creates additional, non-statutory, substantive criteria that must be met prior to a grant of an adjustment application.

103.    Accordingly, CARRP violates Article I, Section 8, Clause 4 of the United States Constitution.

104.    Because of this violation and because CARRP's additional, non-statutory, substantive criteria have been applied to plaintiff.  plaintiff has suffered and continue to suffer injury in the form of an unreasonable delay of their application for adjustment.

## COUNT III - ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 706)

105.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

106.    CARRP constitutes final agency action that is arbitrary and capricious because it "neither focuses on nor relates to a [non-citizen's] fitness to" obtain the immigration benefits subject to its terms.   *Judulang v. Holder*, 132 S. Ct. 476, 485 (2011).

107.    CARRP is also not in accordance with law, is contrary to constitutional rights, and is in excess of statutory authority because it violates the INA and exceeds USCIS's statutory authority to implement (not create) the immigration laws, as alleged herein.

108.    As a result of these violations, Plaintiff has suffered and continues to suffer injury in the form of an unreasonable delay of their application for adjustment.

**COUNT IV - ADMINISTRATIVE PROCEDURE ACT (NOTICE AND COMMENT)**

109.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

110.    The Administrative Procedures Act ("APA"), 5 U.S.C. § 553, requires administrative agencies to provide a notice-and-comment period prior to implementing a substantive rule.

111.    CARRP constitutes a substantive agency rule within the meaning of 5 U.S.C. § 551(4).

112.    Defendants failed to provide a notice-and-comment period prior to the adoption of CARRP.   Because CARRP is a substantive rule promulgated without the notice-and-comment period, it violates 5 U.S.C. § 553 and is therefore invalid.

113.    As a result of these violations, Plaintiff has suffered and continues to suffer

injury in the form of an unreasonable delay of his application for adjustment.

## COUNT V - FIFTH AMENDMENT (PROCEDURAL DUE PROCESS)

114.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

115.    Plaintiff's compliance with the statutory and regulatory requirements established in 8 U.S.C. § 1159 and 8 C.F.R. § 335.3 (for adjustment of status applicants), vests in them a constitutionally protected property and liberty interest.

116.    This constitutionally-protected property or liberty interest triggers procedural due process protection.

117.    Defendants' failure to give Plaintiff notice of his classification under CARRP, a meaningful explanation of the reason for such classification, and any process by which Plaintiff can challenge this classification, violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

118.    Because of this violation, Plaintiff has suffered and continues to suffer injury in the form of an unreasonable delay of their application for adjustment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1.      Enter a judgment declaring that (a) CARRP violates the INA and its implementing regulations; Article 1, Section 8, Clause 4 of the United States Constitution; the Fifth Amendment to the United States Constitution; and the APA; and (b) Defendants violated the APA by adopting CARRP without promulgating a rule and

22

following the process for notice and comment by the public;

2.      Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from applying CARRP to the processing and adjudication of Plaintiff's immigration benefit applications;

3.      Order Defendants to rescind CARRP because they failed to follow the process for notice and comment by the public;

4.      Award Plaintiff reasonable attorneys' fees and costs under the Equal Access to Justice Act; and

5.      Grant any other relief that this Court may deem fit and proper.

RESPECTFULLY SUBMITTED

this 24th day of July, 2017

*/s/ James O. Hacking, III*
James O. Hacking, III, Mo. Bar # 46728
Hacking Law Practice, LLC
34 N. Gore, Suite 101
St. Louis, MO 63119
(O) 314.961.8200
(F) 314.961.8201
(E) jim@hackinglawpractice.com

ATTORNEYS FOR PLAINTIFF